**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Apogee Process Improvement, LLC,<br>6849 Holbein Drive<br>Dublin, Ohio 43016<br><br>Plaintiff,<br><br>vs.<br><br>OEC, LLC<br>1000 North West Street<br>Suite 1200<br>Wilmington, Delaware 19801<br><br>and<br><br>ActiveTrust AI<br>1000 North West Street<br>Suite 1200<br>Wilmington, Delaware 19801<br><br>Defendants. | Case No. ____________________ |

**COMPLAINT**
**with Demand for Jury Trial**

Plaintiff Apogee Process Improvement, LLC ("**Apogee**"), by and for its Complaint against Defendants OEC, LLC ("**OEC**") and ActiveTrust AI ("**ActiveTrust**"), alleges to the Court as follows:

## NATURE OF THE CASE

1. This is an action to address Defendants' misappropriation of Apogee's confidential and proprietary information in the banking compliance space. Apogee and Defendants began working together under the guise of pursuing a joint business opportunity. Apogee shared its confidential and proprietary information related to banking disclosures

with Defendants, so that Defendants could build an artificial intelligence bot for use in banking compliance. After Apogee educated Defendants and helped their bot achieve 90% accuracy (instead of the 10% accuracy it was initially receiving), Defendants cut Apogee out of the relationship and began marketing the jointly developed product as their own. Worse yet, Defendants have refused to address Apogee's concerns amicably, and instead have deflected stating they are not using Apogee's confidential information.

## PARTIES

2. Apogee is an Ohio limited liability company with its principal place of business at 6849 Holbein Drive, Dublin, Ohio 43016.

3. OEC is a Delaware company with its principal place of business at 1000 North West Street, Suite 1200, Wilmington, Delaware 19801.

4. ActiveTrust formerly known as AssureIQ is believed to be a "Doing Business As" name of OEC, rather than a distinct entity.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as Apogee is asserting a claim arising under the laws of the United States. This Court has supplemental subject matter jurisdiction over Apogee's remaining claim pursuant to 28 U.S.C. §1367(a).

6. Venue is proper in the Southern District of Ohio, Eastern Division pursuant to 28 U.S.C. § 1391(b)(2) and S.D. Ohio R. 82.1(e) because a substantial part of the events giving rise to Apogee's claims occurred in this judicial district and division.

## BACKGROUND

### Apogee's Business

7. Apogee provides process improvement services and disclosure services to the financial services industry.

8. In its line of work, Apogee possesses confidential, trade secret information that includes unique compilations of data and institutional know-how related to the banking compliance industry, with particular expertise regarding banking disclosures ("**Trade Secrets**").

9. Apogee takes various measures within its company to ensure that its Trade Secrets are protected, including requiring all employees and contractors to sign a non-disclosure agreement when hired. Furthermore, Apogee maintains extremely limited access to its Trade Secrets and has never given full access to its proprietary database to company employees, exclusively maintaining that access among Apogee's three owners.

10. Additionally, Apogee does not allow any third party to view its database of Trade Secrets without first requiring their execution of a binding non-disclosure agreement.

11. Apogee's database of banking disclosure compliance information helps identify appropriate disclosures for a myriad of different banking situations and is a compliance resource that is highly valuable to the banking industry.

12. The Trade Secrets derive their independent economic value from not being generally known or readily ascertainably by any other person.

### Apogee and OEC Enter a Mutual Non-Disclosure Agreement

13. Apogee and OEC entered into a Mutual Non-Disclosure Agreement ("**NDA**") on October 9, 2024, for the purpose of exploring a possible joint business opportunity.

14. A true and accurate copy of the NDA is attached as Exhibit 1.

15. The NDA prohibits the parties from using any Confidential Information disclosed to them for their own use or for any other purpose than to carry out the joint business opportunity. (Ex. 1, §2.)

16. The NDA defines Confidential Information as any information not generally known or available outside the discloser, including without limitation:

> technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, processes, formulas, techniques, engineering designs and drawings, hardware configuration information, regulatory information, agreements with third parties, lists of, or information relating to, employees and consultants of the Discloser (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed by Discloser (whether by oral, written, graphic or machine-readable format)[.]

(*Id*. at §1.)

17. Under the NDA, the recipient of Confidential Information is prohibited from making any copies or duplicates of any Confidential Information. (*Id*. at §4.)

18. The parties to the NDA acknowledged that:

> due to the unique nature of Discloser's Confidential Information, monetary damages may be inadequate to compensate Discloser for any breach by Recipient of its covenants and agreements set forth in this Agreement. Accordingly, the parties each agree and acknowledge that any such violation or threatened violation may cause irreparable injury to Discloser and, in addition to any other remedies that may be available, in law, in equity or otherwise, Discloser shall be entitled to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Recipient.

(Ex. 1, §14.)

19. Under the NDA, Apogee and OEC sought to combine Apogee's proprietary Trade Secrets for banking compliance disclosures with OEC's artificial intelligence ("**AI**") system to form a market-ready AI disclosure-scanning tool for the banking industry ("**Banking Compliance Tool**").

**Trusting in the NDA, Apogee Educates OEC**

20. From the parties' earliest meeting on October 21, 2024, it was clear that OEC's team had very little knowledge or experience with banking compliance disclosures.

21. After the October 21, 2024 meeting, Apogee shared an initial confidential document under the NDA, which demonstrated the framework for a banking compliance disclosure analysis.

22. Joint brainstorming and development proceeded from that point that included Apogee's Trade Secrets.

23. As an example, on November 13, 2024, OEC employee Yulian Fedulov ("**Yulian**") sent a high-level design document titled "AssureIQ Product Scope - Apogee.v2," which demonstrated creation of a design framework that included Apogee's Trade Secrets and no contribution from ActiveTrust.

24. From December 2024 through mid-January 2025, Apogee worked on lining up proof of concept banks with which to demonstrate the benefits of the Banking Compliance Tool that was being built using Apogee's Trade Secrets and OEC's AI system.

25. In early January 2025, OEC renamed/rebranded its DBA from AssureIQ to ActiveTrust AI.

26. On January 16, 2025, ActiveTrust shared the first working demo of the Banking Compliance Tool with Apogee, which visually looked good, but was extremely inaccurate on substance, with less than 10% accuracy.

27. Following the meeting, Apogee sent three emails to the Active Trust team—again, protected under the NDA—containing more of Apogee's Trade Secrets, including banking compliance data, which were: (a) Apogee's disclosure style guide (from Bruce Marshak, "**Marshak**"), (b) a sample of Apogee's database showing which Disclosures to expect in a standard deposit account agreement ("**DAA**") (sent by Drew Doherty, "**Doherty**") (c) Apogee's proprietary gathering of key banking compliance documents (DAAs and Privacy Notices) for test cases (sent by Brent Bahnub, "**Bahnub**").

28. From the end of January through late April, Apogee and ActiveTrust continued forward with development of the Banking Compliance Tool and held weekly meetings to collaborate and move forward with the endeavor.

29. As Apogee contributed its time and Trade Secrets to building the Banking Compliance Tool with ActiveTrust, ActiveTrust began to show concerning signs of being non-committal to the joint business opportunity. For example, on February 14, 2025, Brent Bahnub communicated Apogee's concerns that the NDA did not adequately address revenue sharing and ownership rights over the Banking Compliance Tool that the parties were jointly creating.

30. Also in that email, Bahnub introduced a suggested a name for the Banking Compliance Tool.

31. Despite concerning reactions from ActiveTrust/OEC, Apogee continued to work on the Banking Compliance Tool in good faith throughout February 2025 and

continued to share additional Apogee Trade Secrets that were essential to the continued development and functionality of the Banking Compliance Tool.

32. On March 3, 2025, Apogee sent ActiveTrust/OEC a proposed agreement to better address the parties' rights regarding the Banking Compliance Tool and a proposed revenue sharing model.

33. The same day, Bahnub continued to work on the Banking Compliance Tool and sent Yulian further Apogee intellectual property in the form of banking disclosure expertise and guidance on incorporating the information into the AI prompts for the tool.

34. On March 6 and March 12, 2025, Doherty provided additional Apogee Trade Secrets regarding the AI bot's accuracy (then, still having a rate of 50% false positives) and provided a list of disclosures the experts at Apogee would expect in a DAA to help better train the Banking Compliance Tool.

35. On March 13, 2025, Apogee provided its disclosure database and Apogee's proprietary definitions of disclosures to train the Banking Compliance Tool. Use of a standard disclosure definition is a key component of the disclosure rationalization process that Apogee performs for it's clients. During the course of collaboration between the parties, OEC modified its scanning approach to having the AI bot look for disclosures contained in Apogee's disclosure database in the documents being scanned. Later that same day, Yulian sent a note to members of the Apogee team indicating that the accuracy of the Banking Compliance Tool had improved from 50% to 90% in a 48-hour period exclusively due to incorporation of Apogee's Trade Secrets and the incorporation of the design and process changes that Apogee recommended.

**OEC Takes Apogee's IP and Cuts Apogee Out**

36. After Apogee improved the Banking Compliance Tool using its Trade Secrets and expertise, ActiveTrust began cutting out Apogee of the relationship and started setting up demo meetings with potential bank clients regarding the Banking Compliance Tool—but excluded Apogee. Apogee obtained this belief because ActiveTrust had included in the list of items to be scanned, documents from financial institutions that Apogee had not suggested to Active Trust and that Apogee believes are ActiveTrust clients.

37. This prompted Apogee to send a revised ownership agreement to OEC's CEO Raj Chakraborty ("**Raj**") on April 11, 2025 to clarify ownership of any IP jointly created during the NDA exploratory period, since the NDA only governed confidentiality and would require destruction of anything created with the other parties IP, absent an agreement for sharing of ownership and revenue for any jointly created property.

38. Raj responded the same day and immediately disagreed that Apogee had any ownership of the Banking Compliance Tool.

39. Discussions progressed on April 15, 2025, and it appeared there was an agreement on an ownership and revenue structure related to the Banking Compliance Tool. Just as quickly, however, those discussions fell apart and communications went silent.

40. On April 22, Apogee's General Counsel, Marshak, sent a letter to OEC and ActiveTrust regarding their ongoing breach of the NDA.

41. On June 5, 2025, Apogee sent OEC another letter through its counsel that outlined the dispute and requested OEC agree to participate in further discussions related to the joint business opportunity.

42. On June 6, 2025, Raj emailed Apogee principals Marshak, Bahnub, Doherty, and stated "we have no intention of marketing anything around your disclosures SSOT. We

have deleted all information we have received from you along with the app (see Yulian's email from April). We have not disclosed the SSOT to anyone, and no AI is trained on your SSOT."

43. Yet, ActiveTrust is currently marketing itself as "redefining how banks approach compliance and risk management," and "tackl[ing] a range of banking risk and compliance functions." (Exhibit 2, ActiveTrust LinkedIn as of June 9, 2025; Exhibit 3, ActiveTrust Website as of June 6, 2025.) The ActiveTrust website focuses its marketing effort on its compliance bot (the Banking Compliance Tool) which only became competent after absorbing Apogee's Trade Secrets.

44. ActiveTrust and OEC attempted to soothe Apogee with false assurances; however, it is clear that they are using Apogee's trade secrets as their own.

**COUNT I**
**Violation of the Defend Trade Secrets Act, 18 U.S.C. §1836, *et seq*.**

45. Apogee repeats and realleges every allegation contained in the preceding paragraphs as though fully set forth here.

46. Apogee's Trade Secrets as described in this Complaint constitute trade secrets within the meaning of 18 U.S.C. §1839(3).

47. The Trade Secrets are products that were intended for use in interstate commerce, within the meaning of 18 U.S.C. §1836(b)(1).

48. Apogee has taken, and continues to take, reasonable and adequate precautions to protect the information underlying the Trade Secrets as set forth in the factual background section above, including severely limiting access to the Trade Secrets within its organization and requiring non-disclosure agreements prior to sharing even portions of the Trade Secrets.

49. Defendants, without justification or privilege to do so, have misappropriated Apogee's Trade Secrets by taking, retaining, and using Apogee's Trade Secrets to further their business interests and to directly and unfairly compete with Apogee by developing a product wholly derivative of the Trade Secrets and which they could not have independently developed but for Apogee sharing its knowledge under the terms of the NDA.

50. As a direct and proximate result of Defendants' actions, Apogee faces the immediate and irreparable loss of its confidential information, the loss of its competitive position, the loss of business goodwill, the loss of sales, and the loss of its investment in the Trade Secrets.

51. As a direct and proximate result of Defendants' violation of the DTSA, Apogee has suffered and will continue to suffer damages.

52. Defendants' conduct was willful and malicious, thereby entitling Apogee to exemplary damages, in addition to the recovery of attorneys' fees.

## COUNT II
## Breach of the NDA

53. Apogee repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth here.

54. The NDA is a valid contract between Apogee and OEC.

55. Apogee performed under the NDA when it disclosed its Trade Secrets to OEC in furtherance of the joint business opportunity.

56. OEC breached the NDA when it used Apogee's Trade Secrets for its own benefit, instead of the benefit of the joint business opportunity.

57. OEC's breaches include setting up demo meetings with potential bank clients unilaterally, without Apogee's involvement.

58. Apogee has been damaged by OEC's breaches, in an amount to be determined at trial.

**REQUEST FOR RELIEF**

**WHEREFORE**, Apogee prays for judgment as follows:

A. That upon a final hearing and determination on the merits, Defendants, as well as their agents, attorneys, successors, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities, be permanently enjoined as follows:

1. Defendants be immediately enjoined from using the Banking Compliance Tool in commerce and from marketing the Banking Compliance Tool, or any other product deriving from the Banking Compliance Tool or Apogee's Trade Secrets;
2. Defendants be immediately ordered to return to Apogee all documents, or other materials in their possession, relating to Apogee and its Trade Secrets;
3. Defendants be otherwise immediately enjoined from breaching their statutory, common law, and contractual obligations to Apogee.

B. On Count One, that Apogee be awarded compensatory and/or consequential damages in an amount equal to the losses suffered as a result of Defendants' misappropriation of Apogee's Trade Secrets under federal law, the exact amount of such damages to be determined at the trial of this action;

C. On Count Two, that Apogee be awarded compensatory and/or consequential damages resulting from Defendants' breach of contract, the exact amount of such damages to be determined at the trial of this action;

D. That Apogee be awarded punitive damages against Defendants;

E. That Apogee be awarded exemplary damages against Defendants;

F. That Apogee be awarded its costs and reasonable attorneys' fees against Defendants;

G. That Apogee be awarded prejudgment and post-judgment interest at the maximum legal rate; and

H. For an award of such other relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

Apogee demands a jury trial on all issues so triable.

Respectfully submitted,



Dated: June 16, 2025

Christopher W. Tackett (0087776)
Graycen M. Wood (0102160)
**Bailey Cavalieri LLC**
10 West Broad Street, Suite 2100
Columbus, Ohio 43215
Phone: 614.229.3286
Fax: 614.221.0479
Email: ctackett@baileycav.com
gwood@baileycav.com

*Counsel for Plaintiff Apogee Process Improvement, LLC*